**Lana ANDERSON, as Administrator of the Estate of Norman Anderson, Plaintiff,**

v.

**BRISTOL, INC. d/b/a Emerson Process Management and/or d/b/a Remote Automated Solutions, Inc.; Irene Bielen (individually and in her corporate capacity; and Craig Rossman (individually and in his corporate capacity), Defendants.**

No. 4:11–cv–418.

United States District Court, S.D. Iowa, Central Division.

March 25, 2013.

Gordon R. Fischer, Bradley M. Beaman, Bradshaw Fowler Proctor & Fairgrove, Des Moines, IA, for Plaintiff.

Gene R. La Suer, Michael C. Richards, Deborah M. Tharnish, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Defendants.

## ORDER

### ROBERT W. PRATT, District Judge.

Before the Court are two Motions for Partial Summary Judgment filed by Defendants, Bristol, Inc. d/b/a Emerson Process Management and/or d/b/a Remote Automated Solutions, Inc. ("Emerson"), Irene Bielen ("Bielen"), and Craig Rossman ("Rossman") (collectively "Defendants"). Also before the Court is a Motion to Amend or Substitute Response ("Motion to Amend"), filed by Lana Anderson ("Plaintiff"), as Administrator of the Estate of Norman Anderson. Clerk's No. 67.

Defendants' first Motion for Partial Summary Judgment ("MSJ I"), filed July 30, 2012, asserts that Defendants are entitled to judgment as a matter of law on Plaintiff's wrongful death claim (Count VII of the Amended Complaint). Clerk's No. 36. Plaintiff resisted the motion on September 17, 2012. Clerk's No. 39. Defendants replied on October 1, 2012. Clerk's No. 42. Defendants' Second Motion for Partial Summary Judgment ("MSJ II"), filed December 14, 2012, requests judgment as a matter of law on Plaintiff's breach of contract, intentional interference with contract, and intentional interference with emotional distress claims (Counts I, II, and IV of the Amended Complaint).

Clerk's No. 47. Plaintiff resisted the motion on January 28, 2013. Clerk's No. 59. Defendants replied on February 8, 2013. Clerk's No. 66. On February 20, 2013, Plaintiff filed her Motion to Amend, requesting leave to file amended or substituted responses to Defendants' statement of material facts in support of Defendants' MSJ II. Clerk's No. 67. Defendants responded on March 5, 2013. Clerk's No. 68. Plaintiff replied on March 15, 2013. Clerk's No. 73. The matters are fully submitted.

## I. PLAINTIFF'S SUPPLEMENTAL MOTION TO AMEND OR SUBSTITUTE HER RESPONSE

According to the Court's Local Rules, a party resisting a motion for summary judgment must support its claims "by references to the specific pages, paragraphs or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record." LR 56(b).[1] "The failure to respond, without appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of fact." *Id.*

In responding to Defendants' MSJ II, Plaintiff failed to support numerous denials of Defendants' asserted facts with citations to the record, thereby violating LR 56(b). *See* Pl.'s Resp. to Material

---

1. Local Rule 56(b) serves as a supplement to Federal Rule of Civil Procedure 56. The Court notes that Defendants' argument as to why certain facts should be deemed admitted is based on Local Rule 56(b), but Plaintiff's motion is filed pursuant to Rule 56(e). Clerk's No. 67. Under Federal Rule of Civil Procedure 56(e), the Court has the discretion, when "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [in conjunction with a motion for summary judgment],

the court may ... give an opportunity to properly support or address the fact." In such a situation, the Court also has the power to "issue any other appropriate order." *Id.* 56(e)(4). The Court, however, need not grant any motion or consider the new information; instead, it may "consider the fact[s] undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." *Id.* 56(e)(2) & (3).

Facts in Supp. of MSJ II (Clerk's No. 59–1). Defendants, accordingly, requested that the Court deem all unsupported denials as admissions pursuant to LR 56(b). *See* Defs.' Br. In Reply to Pl.'s Resistance to Defs.' MSJ II ("Defs.' Reply Br. II") (Clerk's No. 66) at 1. Plaintiff thereafter filed the present Motion to Amend. In her Motion to Amend, Plaintiff fails to provide any reason for not complying with LR 56(b) in the first instance.[2] Instead, she claims to have filed her Motion to Amend due to "a brand new argument" raised by Defendants, i.e., that Defendants, "[f]or the very first time ... attack[ed] Plaintiff['s] response to material facts." *See* Mot. to Amend ¶ 2. Plaintiff goes on to state that the Court should allow the amendment because "(A) No prejudice would result[; and] (B) Plaintiff's Amended Response and Amended Appendix, at the least, will result in a fuller and more robust record for the Court to consider when deciding the question of summary dismissal. The factual issues between the parties will be clearer and more precise." *Id.* ¶ 7.

Defendants respond that the Court should deny Plaintiff's motion because Plaintiff had an adequate opportunity, in the first instance, to respond to Defendants' facts and refused to take it. *See* Defs.' Resistance to Pl.'s Mot. to Amend at 2–3. Further, they claim that such an amendment would be futile and prejudicial. *See id.* at 3–11. Finally, Defendants argue that Plaintiff's "amendments" do not properly respond to Defendants' statement of facts; rather, the amendments rehash legal arguments that have already been asserted in different documents. *See id.* at 4–10. In other words, Defendants contend that Plaintiff's amended responses still do not comply with LR 56(b). *See id.*

The Southern District of Iowa's Local Rule 56(b) is in place "to prevent a district court from engaging in the proverbial search for a needle in the haystack." *Nw. Bank & Trust Co. v. First Illinois Nat'l Bank,* 354 F.3d 721, 725 (8th Cir.2003) (hereinafter "*Nw. Bank II* "). Further, in the interests of efficiency, LR 56(b) cuts down on the time it takes the court "to investigate the record in search of an unidentified genuine issue of material fact." *Libel v. Adventure Lands of Am., Inc.,* 482 F.3d 1028, 1031–32 (8th Cir.2007). Al-

---

**2.** Notably, Plaintiff in the present case is represented by experienced counsel from a well-regarded Des Moines law firm. While the Court grants leniency to *pro se* litigants and may excuse failures to comply with local rules, the same leniency cannot and should not be applied to experienced attorneys. Further, Plaintiff provided no reason for failing to comply despite the fact that she had adequate time to prepare a response to Defendants' statement of material facts. Defendants filed their first Motion for Partial Summary Judgment on July 30, 2012, about seven months prior to Plaintiff's Motion to Amend. *See* Clerk's Nos. 36, 67. Although Plaintiff does not expressly move to amend her response to that motion (Clerk's No. 39), some of the information contained in the current Motion to Amend relates back to Defendants' MSJ I. *See* Pl.'s Am. Resp. at 53–56 (revealing new evidence as to the manner of decedent's death and reiterating arguments in favor of a wrongful death claim that were previously argued in Plaintiff's response to Defendants' First Motion for Partial Summary Judgment).

Plaintiff also had ample time to draft a response in compliance with LR 56(b) with respect to Defendants' MSJ II. Defendants' moved for partial summary judgment on December 14, 2012. Clerk's No. 48. Although originally due on January 7, 2013, Plaintiff requested, and the Court granted, numerous deadline extensions to file her response. Clerk's Nos. 53 (first extension, filed December 21, 2012), 55 (Order granting Plaintiff's first motion for an extension), 57 (Plaintiff's second motion for an extension filed January 14, 2013), 58 (Order granting Plaintiff's second motion for an extension). Plaintiff filed her response forty-five days after Defendants' MSJ II, on January 28, 2013. Clerk's No. 59.

though local rules can help "streamline the resolution of summary judgment motions," *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994); the Court should allow amendments "when justice so requires," Fed.R.Civ.P. 15(a)(2). Indeed, when determining the proper course of action following a motion to amend, the Court should generally choose the option that "encourage[s the] proper presentation of the record." Fed.R.Civ.P. 56 advisory committee's notes (2010).

While the Court finds Plaintiff's reasons for not complying with LR 56(b) in the first instance uncompelling,[3] it agrees with Plaintiff that such an amendment would provide a fuller and clearer record. The Court recognizes that justice requires the most complete record possible when ruling on a motion for summary judgment. As this Court has stated previously:

> Justice is not served by taking a heavy-handed approach to violations of local procedural rules. Non-compliance by counsel slows the judicial process and is certainly frustrating to both opposing counsel and to the Court. Imposing Draconian sanctions for isolated rule violations, however, does far more than simply punish[ ] the attorneys. Rather, such an approach destroys the vital right of the, most likely, innocent client to have her day in Court simply because her attorney mistakenly violates a local procedural rule. This Court will not be

party to such an egregious offense of anyone's right to due process.

*Nw. Bank & Trust Co. v. First Illinois Nat'l Bank*, 221 F.Supp.2d 1000, 1004 (S.D.Iowa 2002) (hereinafter "*Nw. Bank I*"), *rev'd in part on other grounds*, 354 F.3d 721 (8th Cir.2003).[4]

For these reasons, the Court will consider Plaintiff's amended filings in ruling on Defendants' motions. As Defendants accurately point out, however, parts of Plaintiff's Amended Response are improper responses to Defendants' statement of facts. Instead of listing concise and clear responses with appropriate citations to the record or appendix, Plaintiff frequently rehashes legal arguments covered in previous pleadings. *See, e.g.*, Pl.'s Am. Resp. at 15–25 (responding to Defendants' material facts and rehashing legal arguments already made in resisting Defendants' MSJ II). Thus, to the extent the Amended Response asserts *legal* arguments, it will be ignored. Rather, the Court will use Plaintiff's Amended Response and Amended Appendix for the sole purpose of apprising itself of the additional factual information contained therein.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Anderson's First Years at Emerson*

The decedent, Norman Anderson ("Anderson") began working for the Mar-

---

3. First, Defendant was not offering a completely new or novel legal argument. The Court, without guidance from Defendants could rightly have ignored all facts denied by Plaintiff that were not supported by the record. Additionally, Plaintiff was aware or should have been aware of the relevant Local Rule. Therefore, a claim of "surprise" is inadequate. Second, Plaintiff ignores the reality that Defendants raised this argument at the earliest possible time—in their first filing after Plaintiff's response to Defendants' facts. Finally, Plaintiff claims that she has not had the opportunity to be heard on these factual is-

sues. Br. in Supp. of Mot. to Amend at 7. Plaintiff, however, again ignores the fact that she had the opportunity to be heard on the issues and failed to take that opportunity. Notably, Defendants did not raise any additional facts in their Reply to Plaintiff's Resistance to Defendants' MSJ II.

4. In *Nw. Bank I*, the court ultimately denied permission for a party to make certain amendments, but only after that party repeatedly violated the local rules. *Nw. Bank I*, 221 F.Supp.2d at 1006.

shalltown, Iowa office. of Fisher Controls ("Fisher"), a wholly owned subsidiary of Emerson[5] in September of 1999.[6] Defs.' Material Facts in Supp. of MSJ II ("Defs.' Facts II") (Clerk's No. 48–1) ¶ 1. Anderson's signed application stated:

> I understand and agree that my employment is at will and for no definite period and may, regardless of the period of payment of wages or salary, be terminated at any time for any reason without previous notice. I further understand that … no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

Defs.' App. in Supp. of MSJ II (Clerk's No. 48–2) ("Defs.' App. II") at 2. However, just above this statement and the signature box, the following language appears: "THIS APPLICATION REMAINS ACTIVE FOR A PERIOD NOT TO EXCEED THREE MONTHS."[7] *Id.*

Anderson worked for Emerson under the name of Fisher Controls until 2006, when Emerson obtained Bristol, Inc. Defs.' Facts II ¶ 2. After some additional mergers and changes within the parent company, Anderson's employer nominally became Remote Automation Solutions, but Emerson was still the parent-company employer. *Id.* At the time of his termination, Anderson had been employed by Emerson for a little less than ten years. Am. Compl. (Clerk's No. 6) ¶ 12. Between 1999 and 2008, Anderson received a number of promotions and raises. *Id.* ¶ 20. Most recently, in August of 2008, Anderson received a 10% raise from Emerson and a promotion to "controller." *Id.* ¶¶ 20, 21–22.

### B. *Anderson's First Hospitalization for Alcohol and His "Last Chance" Agreement*

Anderson's life while working at Emerson was not without problems. Plaintiff claims that Anderson had "severe mental health impairments," and specifically, that he suffered from alcoholism, drug addiction, depression, personality disorders, and chronic insomnia while he worked for Emerson. Defs.' Statement of Facts in Supp. of MSJ I ("Defs.' Facts I") (Clerk's No. 36–2) ¶ 2. At the end of February 2009, Anderson's alcoholism came to the forefront, and he had to take a leave of absence due to his alcoholic tendencies. App. to Pl.'s Resistance to Defs.' MSJ II ("Pl.'s App. II") (Clerk's No. 59–2) at 10. Anderson entered the hospital on February 26, 2009 for alcohol withdrawal, and missed a substantial amount of work while

---

5. Because Fisher Controls was a division of Emerson, any reference to "Emerson" throughout the order also pertains to Fisher Controls. References to Bristol, Inc. will also be considered as referring to Emerson.

6. Although the Amended Complaint says 1990, it appears from other pleadings that this was a typographical error and that Anderson actually began work in 1999. *Compare* Am. Compl. (Clerk's No. 6) ¶ 11 *with* Defs.' Facts I ¶ 1.

7. In addition to Anderson's employment application, the Appendix to Plaintiff's Resistance to Defendants' MSJ II ("Pl.'s App. II") contains a document from Fisher Controls, signed by Anderson as well as the Fisher Human Resources Manager on October 10, 1999, that indicates either party must give thirty days written notice before terminating Anderson's employment. Pl.'s App. II (Clerk's No. 59–2) at 5. The agreement further states that in the event the employee is "transferred from FISHER CONTROLS to the employment of another company that is a Subsidiary or is Emerson or Fisher … and [the employee] has not entered into a superseding agreement with [the employee's] new employer covering the subject matter of this Agreement, then this Agreement shall continue in effect.…" *Id.* The parties, however, do not mention this agreement anywhere in their additional pleadings. Accordingly, the Court will assume the agreement either was not in effect at the time of Anderson's termination or is not pertinent.

he was receiving therapy. *Id.* at 11. Additionally, Anderson was having financial troubles, and the bank had recently foreclosed on his house. *See* Pl.'s Am.App. to Defs.' MSJ II ("Pl.'s Am.App.") (Clerk's No. 67–3) at 126 (indicating the Anderson family moved on February 28 to a new house and they soon after declared bankruptcy), 129 (indicating the family moved from a foreclosed home); Defs.' App. in Supp. of MSJ I ("Defs.' App. I") (Clerk's No. 36–1) at 26 (autopsy report explaining that Anderson experienced a "recent foreclosure"). Anderson finally returned to work for half days on March 30, 2009. Pl.'s Am.App. at 26. During his time at the hospital, Anderson applied for and received salary continuation pursuant to Emerson's Sick Leave Policy.[8] *See id.* at 27.

As a result of Anderson's hospitalization and alcoholism, he entered into a "last chance" agreement with Emerson. Defs.' App. II at 3–5. The agreement consisted of three pages and twelve numbered paragraphs detailing new rules and the steps that Anderson would have to take if he wanted to remain employed at Emerson. *Id.* Notably, paragraph 10 of the agreement referred to Anderson's at-will employment status, specifically stating: "I also understand that my entering into this agreement, does not, and is not intended to, alter my at-will employment status with the Company." *Id.* at 4. Anderson signed the agreement on April 20, 2009, and Bielen approved it on May 18. *Id.* at 5.

C. *Anderson's Mother's Death and Anderson's Work Situation Surrounding the Death*

Nothing of particular relevance to this case occurred between April 20 and July 13, 2009. However, on Monday, July 13, 2009, Anderson emailed Rossman to inform him that Anderson's mother was close to death and that it likely would "only be a matter of days" until she passed away. Pl.'s Am.App. at 85. Rossman responded a little over an hour later and requested that Anderson "keep [him] updated, so that the team and [Rossman could] assist [Anderson] as best as possible." *Id.* Anderson then took Tuesday afternoon off and told Rossman that he would probably be absent on Wednesday as well, but that he would "check email nightly, and keep [Rossman] up to date." *Id.* On Wednesday morning at 7:30 AM, Rossman requested that Anderson provide some additional financial information to the company. *Id.* at 92. Anderson responded fourteen hours later that he would "work on this in the morning," adding that he would likely be absent from work on Thursday. *Id.* On Thursday, July 16, Rossman emailed additional questions to Anderson, and Anderson responded within a few hours. *Id.* at 86–87.

Later in the afternoon on July 16, Anderson's mother passed away. *Id.* at 95. On Friday morning, July 17, Anderson set up an "Out of Office AutoReply: My Mother" email, stating that he would be out of the office with "limited access to email," but "w[ould] respond as soon as possible." *Id.* at 94. Additionally, on the morning of July 17, Anderson informed Rossman that his mother had passed away and the funeral would likely take place on Tuesday, July 21. *Id.* at 95. Rossman offered his condolences and told Anderson to "keep [him] updated on the requirements for [Anderson's] time away from the office to be with [his] family." *Id.*

Anderson then took three days of bereavement leave and was absent from work from Monday, July 20 until Wednesday, July 22, 2009. Defs.' Facts II ¶ 15. Despite knowing Anderson was out of the office for bereavement leave, Rossman sent two emails on July 20 to Anderson's

---

8. This policy will be discussed in greater detail in Section II.E of this Order.

work email, requesting additional financial information and calculations. *See* Pl.'s Am.App. at 96–97. Rossman also inquired of Anderson's assistant[9] what his schedule might be for the week. *Id.* at 98–99. Further, Rossman emailed Bielen on July 21 to inquire about Anderson's vacation time. *Id.* at 100. At no point between July 20 and July 22 did Anderson communicate with Rossman. Defs.' Facts II ¶ 16.

On Thursday, July 23, Anderson contacted Rossman and indicated he would be working from home. *Id.* ¶ 18. The month-end financial closing date was Friday, July 24, and on July 23, Rossman emailed Anderson asking for specific financial information and reminding Anderson to update certain documents. Pl.'s Am. App. at 101–02. Anderson replied with some information later that evening.[10] *Id.* at 103.

The following day, Friday, July 24, Anderson informed the company (specifically Rossman) that he had a flat tire and would not be in the office. Defs.' Facts II ¶ 19. Rossman sent two emails the same morning requesting information from Anderson. Pl.'s Am.App. at 104, 106. Anderson responded with answers to both questions.[11] *Id.* at 106. Rossman sent another email that morning asking Anderson to call his cell phone. *Id.* at 105. The record is unclear whether Anderson made this call or not. *See* Pl.'s Am. State-

ment of Facts in Resp. to Defs.' MSJ II ("Pl.'s Am. Facts") (Clerk's No. 67–2) at 45 (explaining that "Anderson may well have returned the call" and that "[t]here [was] no further email discussion"). In the afternoon, Rossman sent additional emails requesting information from Anderson, but there was no response to these requests. Pl.'s Am.App. at 108–09; *see* Pl's Am. Facts at 45 ("A third email question seemed to go unanswered."). Finally, at 6:51 PM on Friday, July 24, Rossman sent Anderson a list of things that needed to be done by Monday morning. Pl.'s Am.App. at 111. He specifically told Anderson that he was "out of time to wait" and that "[i]f there is an issue that I need to be made aware of, please call me. Otherwise I will expect to see this data by 8[AM] CDT on Monday." *Id.* Rossman sent a follow-up email a little less than an hour later reminding Anderson of another fact to keep in mind when preparing the data. *Id.* at 112. Rossman did not receive any phone calls or any information from Anderson over the weekend or on Monday morning. Defs.' Facts II ¶ 21.

### D. *Anderson's Suicide Attempt, Resulting Hospitalization, and Termination*

On the evening of Friday, July 24 (the last day of the week of his mother's death), Anderson returned home and began to drink. Pl.'s Am.App. at 130 (Pl.'s Dep. at

---

9. The Court is uncertain as to Margaret Allen's exact relation to Anderson. It appears, however, that she works as an assistant to Rick Vanderah, but also is an assistant to *other employees in some respects*—specifically in scheduling. *See* Pl.'s Am. Statement of Facts at 38; Pl.'s Am.App. at 94, 95 (Ms. Allen is listed as a carbon copy recipient of multiple emails sent to and from Anderson regarding his time out of the office), 98.

10. This email chain suggests that Anderson and Rossman talked on the phone at some point as well. Neither party, however, has provided to the court the contents of such a

phone call. *See* Pl.'s Am.App. at 102 ("I need the information *we discussed today* by tomorrow morning." (emphasis added)), 103 (Anderson stating, "The '08 Chesapeake shipments were $1,000,112 with commission of $177,136"). Notably, there are only two emails in the record sent by Rossman on this date and neither requests information about "Chesapeake shipments." *See id.* at 101–03 (emails from July 23).

11. The two questions dealt with wage inflation over a three-year period and asked where $60,000 in savings was located. Pl.'s Am. App. at 104, 106.

159). He continued drinking throughout the weekend—during the day on Saturday, July 25 and Sunday, July 26. *Id.* (Pl.'s Dep. at 159–60). Late Sunday night or early Monday morning, Anderson told his wife, "I'm sorry, I shouldn't have done it.... I shouldn't have taken—I shouldn't have taken all of them." *Id.* (Pl.'s Dep. at 161). Plaintiff rushed to the bedroom and found her husband's empty pill bottle; Anderson had taken almost an entire bottle of Trazodone.[12] *Id.* at 130–31 (Pl.'s Dep. 161–62). Plaintiff rushed her husband to the hospital, and he was admitted during the early hours of Monday, July 27. *Id.* at 131 (Pl.'s Dep. at 164). Plaintiff then called one of Anderson's co-workers, Rhonda Spence, and explained the entire situation. *Id.* (Pl.'s Dep. at 165). Plaintiff asked Ms. Spence to inform Vice President of Technology Rick Vanderah ("Vanderah") of the events and circumstances of the suicide attempt. *Id.* On July 27, Vanderah heard about the hospitalization from a "family friend" of the Andersons and informed Rossman that Anderson was in the hospital. Pl.'s App. II at 25.

A few days later, on July 30, 2009, Anderson was involuntarily committed and moved to Waterloo. *See* Pl.'s App. to Resistance to Mot. to Dismiss (Clerk's No. 14–2). Anderson remained involuntarily committed until August 3. Pl.'s Am.App. at 29. Plaintiff claims that from the time of his admission to the emergency room until his discharge from the psychiatric ward, Anderson did not have access to a telephone. *See* Br. in Supp. of Pl.'s Resistance to Defs.' MSJ II ("Pl.'s Resistance II") (Clerk's No. 59–3) at 13[13]; Pl.'s Am. App. at 29.

While Anderson was out of the office, work continued at Emerson. On the first day of Anderson's unexpected absence, July 27, Rossman began inquiring about Anderson's status. *See* Pl.'s App. at 21–24. Rossman sent an email to Anderson at 11:32 AM simply asking "Are you in the office today?" *Id.* at 114. After receiving no reply, Rossman made multiple other attempts to contact Anderson on his office phone, home phone, and mobile phone. Defs.' Facts II ¶ 23. Neither Anderson nor a family member responded to Rossman's calls. *Id.* Although Rossman did not know of Anderson's whereabouts from a member of the Anderson family, Vanderah claims to have called Rossman on July 27 and informed him that he had heard that Anderson was in the hospital and would likely be gone for two weeks. *See* Pl.'s App. II at 25. As a result of Anderson's absence, Rossman had to make arrangements to fly an employee from Connecticut to Marshalltown to obtain the financial information needed for the month-end closing. Defs.' Facts II ¶ 24.

Additionally, on Monday, July 27, Rossman contacted Bielen regarding Anderson's employment status with the company. *See* Pl.'s Am.App. at 115–16; Pl.'s App. II at 23.[14] By Tuesday morning,

---

12. Trazodone is a prescription antidepressant and should not be taken with alcohol. *See Trazodone*, PubMed Health U.S. Nat'l Library of Medicine (Nov. 1, 2012) http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012504/?report=details.

13. The Court notes that Plaintiff has attempted to cite a document from McFarland Clinic, but Plaintiff has failed to provide the Court with the cited document. Defendants have not challenged this assertion, however, and construing all facts and reasonable inferences in favor of the nonmoving party, the Court will adopt, as fact, for purposes of this motion, that Anderson did not have access to a phone during his hospital stay.

14. These emails discuss prior problems with Anderson and show that Bielen was gathering information to talk with "Jeff"—presumably Jeffrey R. Carius, Vice President and Chief Employment Counsel. *See* Pl.'s Am.App. at 5 (listing "Jeffrey R. Carius" as a representative

July 28, Bielen knew that Anderson was in the hospital as well.[15] Pl.'s App. II at 24. After talking the situation over with one another, Bielen and Rossman went to an Emerson attorney to seek guidance. Defs.' Facts II ¶ 26. After discussing Anderson's situation with the attorney, Bielen and Rossman, with the full authority of Emerson, decided to terminate Anderson's employment. *Id.* Bielen sent a termination letter to Anderson's last known address on Wednesday, July 30, 2009. *Id.* ¶ 27. The letter cited Anderson's failure to attend work since Friday, July 24 and his failure to notify his employer about his absence or whereabouts. *Id.* Anderson, however, never received this letter because it was sent to an old address. *See* Pl.'s App. II at 26.

On the morning of Tuesday, August 4, Plaintiff stopped by Emerson to drop off a document regarding Anderson's hospitalization, and Vanderah forwarded this document to Bielen. Pl.'s App. II at 28–29. The document, dated August 3, simply stated that Anderson had been hospitalized since 7–24–09; it did not, however, contain a return-to-work date. *Id.* at 28 (document from McFarland Clinic stating that Anderson had been hospitalized and "May not return to work until reevaluated"). When Anderson was released from the hospital on August 3, he called Vanderah, who informed Anderson that he needed to speak with Rossman or Bielen. Pl.'s Am.App. at 129 (Pl.'s Dep. at 174). Anderson called Bielen around 3:00 that afternoon. Pl.'s App. II at 29. During that conversation, Bielen explained that Emerson had terminated Anderson's employment due to no-call/no-show. *Id.* Biel-

en also claimed that Emerson had "no idea what was going on" during the time Anderson was out of the office, and that "Rick [Vanderah] did not get [the] message" from Anderson's wife. *Id.* Anderson then begged for his job back, told Bielen that she did not understand the situation, and stated that he had a family and needed his job to take care of that family. Pl.'s Am.App. at 129 (Pl.'s Dep. at 176). Anderson was crying during this phone call. *Id.* Anderson informed Bielen that he would be back at work that Thursday. Pl.'s App. II at 29. Bielen responded that Anderson's actions were unacceptable and although "[she was not] sure if it will change anything," Anderson could call Rossman. *Id.* During this conversation, Bielen did not use confrontational, harsh or inappropriate language. Defs.' Facts II ¶ 34. She acted professionally and discussed the situation calmly. *Id.* Anderson said he would call Rossman, but never did. Pl.'s App. II at 29. The following day, August 5, Bielen obtained Anderson's updated address and sent a copy of the termination letter. *See id.* at 25–26.

### E. *Emerson's Policies and Procedures: Sick Leave Policy, Employee Handbook, and At–Will Policy*

Defendants claim that during his time at Emerson, Anderson was subject to a number of different policies and procedures contained in various documents on an intranet site as well as in employee handbooks and other directives in the office. *See* Pl.'s Am.App. at 4. Four of these policies and portions of those policies are relevant to this case: Emerson's Sick Leave Policy, Emerson's Absences & At-

---

of Emerson), 115 (Bielen asking for documentation of a recent problem and explaining, "Jeff may want to take a look a[t] this"); Pl.'s App. II at 23 (Bielen responding to Rossman's description of Anderson's problems and stating, "This is good for me to get the ball rolling with Jeff.").

15. Likely, she knew of the situation sometime on Monday, July 27. *See* Pl.'s Am.App. at 115 (email from July 27 stating, "I don't want us to be viewed as unsympathetic to the fact that his mother just passes away which he may claim brought this episode on, etc.").

tendance Policy, a disclaimer contained in the employee handbook, and Emerson's Employment-at-Will Policy. The Defendants also point out two more documents that may play a role in the case—Anderson's employment application and Anderson's "Last Chance" agreement, both referenced *supra.*

Emerson's Sick Leave Policy sets out the procedure regarding salary continuance for "eligible employees for periods of absence resulting from the employee's sickness or injury." Pl.'s Am.App. at 1. The policy provides, in pertinent part:

In order to be eligible for salary continuance, each employee absent due to illness or injury in excess of three (3) days is required to submit a signed doctor's certificate to the Human Resources Department. This certificate must show the first day of absence, the nature of the illness and the return to work date. No payment will be made without a properly · executed doctor's certificate. . . .

Upon receiving a return to work release, employees will be reinstated to the same or equivalent position with the same pay, benefits and terms and conditions of employment provided that [*sic*] are able to perform the duties of the occupation without restriction or where reasonable accommodation can be made to provide for continued employment. . . .

Excessive absenteeism, even if caused by injury or illness [*sic*] may be grounds for termination if it interferes significantly with or causes any undue hardship upon the performance of duties.

*Id.* at 1–2. The Sick Leave Policy lists as a "Related Procedure," PERS 11, which corresponds to the Absences & Attendance Policy and Procedure. *Id.* at 1.

The Absences & Attendance Policy and Procedure explains that Emerson "[d]oes not wish to penalize an individual for excusable absences or lateness and will only do so when such absences or lateness become unfair, unreasonable or excessive." *Id.* at 6. In the event of an absence, the document requires the employee to "notify [his or her] Supervisor or the Personnel Department promptly." *Id.* at 7. It further states that absences are considered "excessive" when the amount reaches "more than five days per year." *Id.*

In addition to other documents and policies, Emerson generally distributes an employee handbook to all employees. *See* Defs.' App. II at 45 (Bielen Aff. ¶ 9). After receiving this handbook, employees are required to sign a sheet accompanying the book stating that they received it.[16] Pl.'s App. II at 4. The January 2009 handbook contained two disclaimers:

*Employment-at-Will Disclaimer*

We are an at-will employer and operate under the provision that employees have the right to resign their position at any time, with or without notice, and with or without cause. We, the employer, have similar rights to terminate the employment relationship at any time, with or without notice, and with or without cause[.]

*Handbook Disclaimer*

█ This Employee handbook is provided as a guide and is not considered a contract. The contents of this Handbook are presented as a matter of information only. RAS [Emerson] reserves the right to make changes to policies, procedures, and other statements made in this employee handbook. Business conditions, Federal and State Law, and organizational needs are constantly in

---

**16.** Indeed, this is general practice for Emerson employees. *See* Pl.'s Am.App. at 67 (Rossman's signed receipt), 68–69 (Bielen sig- nature pages), 70–71 (Vanderah signature pages).

flux and may require that portions of the handbook be re-written. This is necessary to successfully provide the appropriate guidance and to obtain the goals of the organization. You are encouraged to ask for and receive more information about any subject contained in this Handbook.

Def.'s App. II at 33. Despite the general practice of distributing the handbook to all employees, there is no evidence in the record that Anderson received the handbook.[17]

Finally, Emerson had an Employment-at-Will Policy in place. *Id.* at 6. In pertinent part, the policy reads:

In accepting or continuing employment with Remote Automation Solutions [Emerson], employees agree that their relationship with Remote Automation Solu-

tions is, and always has been, strictly voluntary and at-will on both sides.

Nothing in the Employee Handbook or in any other document issued by Remote Automation Solutions will alter this at-will relationship except legally ratified union contracts or employment agreements signed by both the employee and the President of Remote Automation Solutions....

To ensure that all employees have been fully advised of our at-will relationship, *they will be required to sign a receipt and acknowledgment for the Employment at will statement* and the Employee Handbook on their first day of hire.

*Id.* at 6 (emphasis added). Plaintiff claims that Anderson never received the document. See Pl.'s Am. Facts at 29–30.[18]

---

17. Defendants claim that the Court should accept as a fact that Anderson received the Employee Handbook and the Employment-at-Will Policy because these facts were supported by Bielen's Affidavit. *See* Reply in Supp. of Defs.' MSJ II (Clerk's No. 66) at 3. The Court, however, need not accept information in affidavits if the information lacks sufficient support. *See* Fed.R.Civ.P. 56(c)(4). According to Rule 56, affidavits that are "used to support or oppose a motion must be made on personal knowledge ... and show that the affiant ... is competent to testify on the matters stated." *Id.* In the present case, Bielen's statement that Anderson received the employee handbook fails to satisfy either of these requirements. Bielen stated she only spoke with Anderson on less than three occasions— one of which was following his termination. Defs.' App. II at 46 (Bielen Aff. ¶ 21). She has failed to provide any context surrounding the distribution of the handbooks, including date or location. Most unsettling, however, is the fact that Bielen lacks personal knowledge of whether Anderson received the handbook. Bielen works in Connecticut, and nothing in her affidavit (or in the record) indicates that she traveled the thousand-plus miles to Marshalltown, Iowa to distribute employee handbooks or oversee their distribution. Thus, the Court cannot accept Bielen's representation as fact when ruling on Defendants' motions.

Additionally, under Federal Rule of Civil Procedure 56(c)(1)(B), a party can support an assertion by "showing ... that an adverse party cannot produce admissible evidence to support [a] fact." In her requests for admissions, Plaintiff asked Defendants to admit that one of the Defendants have a copy of Anderson's signed acknowledgment, and Defendants responded that none of them have been able to locate such a document. Pl.'s Am.App. at 47. By demonstrating other parties signed documents stating they had received the employee handbook and by demonstrating that Defendants could not produce a signed sheet by Anderson, Plaintiff has raised an issue of fact as to whether Anderson did or did not receive the employee handbook. *See* Pl.'s Am. Facts at 17–18.

18. Defendants have not produced any evidence that Anderson received this policy other than Bielen's affidavit. For the reasons listed, *supra,* in footnote 17, the Court must ignore Bielen's affidavit with respect to the Employment-at-Will Policy. Unlike the Employee Handbook, however, Plaintiff has not demonstrated that Anderson did *not* receive the Employment at Will Policy, so the Court cannot assume the fact in favor of one party or the other.

F. *Anderson's Death and Autopsy*

After Anderson's termination, he became depressed and lethargic. Pl.'s Am. App. at 132 (Pl.'s Dep. at 183). He did little more than lay in bed or on the couch and would not shower. *Id.* Then, on August 11, 2009, as Anderson was getting ready to leave his house to attend a substance abuse meeting, he told his wife, "without a job to take care of [my] family, there [is] no reason for [me] to be here anymore." *Id.* (Pl.'s Dep. at 184). Right before he walked out the door, he told his wife, "Remember I have always loved you." *Id.* (Pl.'s Dep. at 185). Later that same night, a vehicle was reported in a bean field at approximately 11:30 PM. Defs.' App. I at 26. A few hours later, in the early morning hours of August 12, a local resident noticed smoke in a creek bed. *Id.* at 31. There was an irregular path from the road through the field to the creek embankment. *Id.* The embankment was not visible from the road. *Id.* Anderson's heavily charred body was found in the car. *Id.* at 27.

After performing an autopsy, the medical examiner concluded that Anderson had a significant amount of alcohol in his system as well as a toxic level of paroxetine—a drug used to treat depression and other mental illnesses. *See id.* at 32; Pl.'s Resistance to Defs.' MSJ I (Clerk's No. 39) at 8. Due to other evidence, such as the fact that there was an irregular path to the creek and the embankment was not visible from the roadway, the medical examiner stated her opinion that Anderson's death was an accident. *See* Defs.' App. I at 32. She did not, however, completely exclude an overdose of paroxetine as a possible cause of death. *Id.* Anderson's certificate of death reiterated the medical examiner's findings and listed the manner of death as an accident. *Id.* at 47.

G. *Procedural Background*

Plaintiff originally filed a complaint on July 25, 2011 in the Iowa District Court in and for Marshall County against Defendants Emerson, Bielen, and Rossman. On September 8, 2011, Defendants removed the action to this Court on the basis of diversity jurisdiction. *See* Notice of Removal (Clerk's No. 1) at 2. A week later, on September 15, Defendants filed a Motion to Dismiss claiming that the Plaintiff incorrectly filed the case and, thus, lacked standing. Clerk's No. 2. Additionally, Defendants moved to dismiss certain counts due to inadequate pleadings. Shortly thereafter, on October 11, Plaintiff filed an Amended Complaint curing the defect in her original pleading,[19] and asserting three additional federal claims. *See* Am. Compl. The Court then dismissed Defendants' original Motion to Dismiss as moot. Clerk's No. 8. The Amended Complaint asserts the following ten claims: Count I, breach of written contract (against Defendant Emerson); Count II, intentional interference with written contract, or alternatively, intentional interference with at-will employment[20] (against Defendants Bielen and Rossman); Count III, fraud; Count IV, intentional infliction of emotional distress; Count V, violation of the Iowa Civil Rights Act ("ICRA"); Count VI, wrongful discharge; Count VII, wrongful death; Count VIII, unlawful interference, restraint, or denial of FMLA rights; Count IX, retaliation for exercising FMLA rights; and Count X, disability discrimina-

---

19. Plaintiff changed the party to read: "Lana Anderson, as Administrator of the Estate of Norman Anderson," rather than simply "Estate of Norman Anderson."

20. The "intentional interference with at-will employment" claim was not raised in the complaint. Rather, Plaintiff raised this claim for the first time in her response to Defendants' MSJ II. *See* Pl.'s Resistance II at 22–23.

tion in violation of Americans with Disabilities Act ("ADA"). *See generally id.*

On October 21, 2011, Defendants moved to dismiss Plaintiff's Amended Complaint. Mot. to Dismiss Pl.'s Am. Compl. (Clerk's No. 9). Although it did not fully grant Defendants' motion, the Court dismissed Plaintiff's claims as to Counts II, fraud, and VI, wrongful discharge. Clerk's No. 22. Thus, following the Court's order, only eight causes of action remain. The present Motions for Partial Summary Judgment submit that judgment as a matter of law must be granted in Defendants' favor on four of those claims—Count I, breach of written contract; Count II, intentional interference with written contract; Count IV, intentional infliction of emotional distress; and Count VII, wrongful death. Clerk's Nos. 36, 48.

### III. SUMMARY JUDGMENT STANDARD

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[21] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[22] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is

---

21. Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

22. Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co.*

*v. Shore,* 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

■ Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

## IV. LAW AND ANALYSIS

Defendants have moved for partial summary judgment in an attempt to dismiss four of Plaintiff's eight remaining claims. Defendants' MSJ I solely asks the Court to grant summary judgment on Plaintiff's claim for wrongful death (Count VII). Defendants' MSJ II requests that the Court grant summary judgment on Plaintiff's claims for breach of contract (Count I), intentional interference with written contract (Count II), and intentional infliction of emotional distress (Count IV). Defendants' MSJ II also raises additional arguments as to why summary judgment on Plaintiff's wrongful death claim (Count VII) is warranted. The Court will consider each motion separately. Because the Court is hearing the case due to diversity jurisdiction, *see* Notice of Removal, it must apply the substantive laws of the forum state—in this case, Iowa. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.").

### A. *Defendants' MSJ I*

In MSJ I, Defendants ask the Court to grant judgment as a matter of law in their favor on Plaintiff's wrongful death claim (Count VII). Defendants claim that Plaintiff has failed to point to any facts that demonstrate either: (1) that Anderson committed suicide; or (2) that, assuming Anderson's death was a suicide, Defendants caused the suicide. Defs.' Br. in Supp. of MSJ I ("Defs' Br. I") (Clerk's No. 36-1) at 7-10. Additionally, Defendants assert that Plaintiff should be prohibited from using any expert testimony because

she failed to comply with the expert disclosure requirements contained in the recently amended version of Federal Rule of Civil Procedure 26(a)(2)(C). *Id.* at 10-11. More specifically, Defendants contend that Plaintiff failed to provide "a summary of facts and opinions to which [each non-retained expert] witness is expected to testify" as required by the Rule. *Id.* at 10 (quoting Fed.R.Civ.P. 26(a)(2)(C)). As a result of Plaintiff's inadequate disclosure, Defendants implicitly ask the Court to prohibit all expert witnesses from testifying and to prohibit Plaintiff from relying on expert testimony.[23] *See id.* at 10-11. Defendants then argue that without expert testimony, Plaintiff will not be able to meet her burden of demonstrating either element of wrongful death—that Anderson committed suicide, or that Defendants' actions led to the suicide. Plaintiff responds that her expert disclosures comply with Rule 26(a)(2)(C), that the autopsy report raises a genuine issue of material fact as to the manner of death,[24] and that the disputed circumstances surrounding Anderson's death lead to a genuine issue of material fact as to causation. *See* Pl.'s Resistance to Defs.' Mot. for Partial Summ. J. ("Pl.'s Resistance I") (Clerk's No. 39) §§ II.B, II.C, II.D.

The Court will first discuss Defendants' implicit motion to strike expert testimony based on Plaintiff's inadequate 26(a)(2)(C) disclosures. Then, it will consider the two fighting issues of the wrongful death claim—whether Anderson's death was a suicide and whether Defendants were the cause of the suicide. Although the Court disagrees with Defendants' proposed discovery sanction of prohibiting all expert testimony, it nevertheless agrees that

---

23. Despite Defendants' failure to raise this issue in a separate motion, the Court will construe this part of Defendants' brief as a motion to exclude expert testimony.

24. The parties repeatedly refer to the manner of death as the "cause of death." In this context, "manner of death" means how the car crash came to be—whether the crash was intended as a suicide or simply an accident.

Plaintiff has failed to identify sufficient evidence to overcome Defendants' MSJ I. Based on a thorough review of the present record, the Court, assuming the death was a suicide, finds that Plaintiff has failed to generate a genuine issue of material fact as to the causation aspect of the suicide. Thus, for the reasons set forth below, the Court GRANTS Defendants' MSJ I and DISMISSES Count VII of Plaintiff's Complaint.

1. *Defendants' implicit motion to exclude expert testimony.*

To help resolve tensions and clarify when non-retained experts had to provide expert reports, the Advisory Committee to the Federal Rules of Civil Procedure recently amended the disclosure rules for non-retained experts. *See* Fed.R.Civ.P. 26(a)(2)(C) advisory committee's note. Effective December 1, 2010, parties must not only identify non-retained witnesses, but also must disclose "the subject matter on which the [non-retained expert] witness is expected to present ...; and a summary of the facts and opinions to which the witness is expected to testify." Fed. R.Civ.P. 26(a)(2). Therefore, under the current rule, if a party fails to comply with the new requirements, a sanction may be appropriate. *See* Fed.R.Civ.P. 37(c)(1). The Court then, must consider two questions: (1) Did the party comply with the rule? and (2) If not, what should be the appropriate sanction?

a. *Did Plaintiff comply with the disclosure requires under amended Rule 26(a)(2)(C)?*

■ On its face, Rule 26(a)(2)(C) requires "a summary of the facts and opinions to which the [non-retained expert] witness is expected to testify." Due to its relatively recent enactment, however, few courts have explained precisely what the rule demands. District courts have repeatedly held that a mere citation to rec-

ords fails to satisfy the requirements of the new rule. *See, e.g., Lopez v. Keeshan,* No. 4:11CV3013, 2012 WL 2343415, at *4 (D.Neb. June 20, 2012) (holding that the "names and the connection" of the experts, without more, was insufficient to comply with 26(a)(2)(C)); *Ballinger v. Casey's Gen. Store, Inc.,* No. 1:10–cv–1439, 2012 WL 1099823, at *4 (S.D.Ind. Mar. 29, 2012) ("[M]edical records alone do not comply with Rule 26(a)(2)(C)."); *Kristensen ex rel. Kristensen v. Spotnitz,* No. 3:09–CV–00084, 2011 WL 5320686, at *2 (W.D.Va. June 3, 2011) (finding that the names of the witnesses along with an indication that "'medical records' ... which had been submitted 'in previous discovery'" was insufficient to comply with the rule); *Nicastle v. Adams Cty. Sheriff's Office,* No. 10–cv–00816, 2011 WL 1674954, at *1 (D.Colo. May 3, 2011) (holding that a citation to 963 pages of personnel files was not an appropriate "summary" as required by 26(a)(2)(C)); *Crabbs v. Wal–Mart Stores, Inc.,* No. 4:09–cv–00519, 2011 WL 499141, at *1–3 (S.D.Iowa Feb. 4, 2011) (explaining that a "timely designation" that is "accompanied by [a] written functional capacity evaluation, associated test results, physical exam notes, and history ... is sufficient to comply with [Fed R. Civ. P. 26](a)(2)(C)," but a mere reference to medical records should be considered an "absence of [a] Rule 26(a)(2)(C) summar[y]"). "A summary is defined as a brief account that states the main points of a larger body of information." *Nicastle,* 2011 WL 1674954, at *1; *see also Ballinger,* 2012 WL 1099823 at *4 (explaining that "medical records go beyond a mere summary," and that to allow medical records alone to be sufficient "would invite a party to dump a litany of medical records on the opposing party, contrary to the rule's attempt to extract a 'summary'" (internal citations omitted)); *Kristensen,* 2011 WL 5320686 at *2 ("But whatever the precise meaning

of the requirement, a 'summary' is ordinarily understood to be an 'abstract, abridgement, or compendium.'" (quoting Merriam Webster's Collegiate Dictionary 1179 (10th ed. 1993))).

■ The Court finds the preceding cases' reasoning persuasive, and holds that when a party merely states the name of the witness along with the witness' connection to the case, or where the party solely refers to medical or similar records that have already been produced, without providing a summary of the witness' expected testimony, the party is not in full compliance with the disclosure requirements found in Rule 26(a)(2)(C). *See, e.g., Lopez,* 2012 WL 2343415 at \*4; *Ballinger,* 2012 WL 1099823 at \*4. Based upon this finding, Plaintiff has failed to adequately disclose any expert witnesses.[25] None of her disclosures contain a "summary of facts and opinions" as required by Rule 26(a)(2)(C). Instead, the disclosures fall into two categories. First, for all non-treating physicians, Plaintiff merely states the witness' occupation, connection with the case, and then states what type of expertise the witness "presumably" possesses. A typical non-treating-physician disclosure for Plaintiff is as follows:

> Boswell, Mark. Autopsy Technician. Mr. Boswell was an Autopsy Technician, as listed on "Report of Autopsy of Norman Anderson," Plaintiff's Potential Exhibit. Also, *presumably,* Mr. Boswell has knowledge about situations and scenes where a decedent is found, investigating situations and scenes where a decedent is found, and laws, regulations, and proper procedures governing situations where a decedent is found and

investigating situations where a decedent is found, as well as performing autopsies, preparing reports of autopsies, and laws, regulations, and proper procedures governing performing autopsies and preparing reports of autopsies. Finally, Mr. Boswell *presumably* has all the education, training, experience, scientific and technical expertise, and other specialized knowledge one would expect an Autopsy Technician to possess.[26]

Pl.'s Resistance I at 18–19 (emphasis added). Plaintiff's disclosures of treating physicians are much shorter, and state only the name of the physician, the physician's title, and then refer Defendants to previously produced medical records.[27] For example, a typical treating-physician disclosure is as follows: "Demmel, James. Treating physician. See medical records produced." *Id.* at 19.

Out of Plaintiff's thirty expert disclosures, none contains an appropriate "summary of facts and opinions" that comply with either the letter or the spirit of Rule 26(a)(2)(C). Rather, they are the types of disclosures that other courts have rejected in *Lopez, Ballinger, Kristensen,* and *Nicastle.* While not constrained by these decisions, this Court finds their reasoning persuasive, and thus concludes that Plaintiff has failed to adequately disclose experts pursuant to Rule 26(a)(2)(C).

b. *What is the appropriate sanction for failing to disclose expert testimony pursuant to Rule 26(a)(2)(C)?*

■ Upon finding that a Rule 26 disclosure was inadequate or there was a failure to disclose, courts are faced with a second, and in many ways, more important, ques-

---

**25.** Plaintiff's "disclosures" are contained in her answer to Defendants' Interrogatory No. 3. Pl.'s Resistance I at 17–26.

**26.** Plaintiff's other answers follow the same pattern, but change the witness's name and occupation.

**27.** The Court possesses almost none of these medical records. Rather, Plaintiff implies that Defendants have received them in initial discovery.

tion—how should the offending party be sanctioned? Under Federal Rule of Civil Procedure 37(c)(1), a judge can pass down a number of potential punishments for failure to comply with a rule. If the failure to properly disclose was neither justified nor harmless, the penalty can include a complete prohibition of any information obtained through the expert witness on any motion, at any hearing, or at trial. *See* Fed.R.Civ.P. 37(c)(1). The choice of the sanction or remedy, however, lies within the wide discretion of the trial court. *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir.2008). Moreover, the text of the rule requires the trial court to consider whether "the failure was either substantially justified or ... harmless." Fed. R.Civ.P. 37(c)(1).

 To aid in the Court's determination of whether the failure was substantially justified or harmless and to help decide upon an appropriate sanction or remedy, the Eighth Circuit has instructed trial courts to consider, *inter alia*, the following four factors: "[(1)] the reason for noncompliance; [(2)] the surprise and prejudice to the opposing party; [(3)] the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and [(4)] the importance of the information or testimony." *Wegener*, 527 F.3d at 692 (citing *Sellers v. Mineta*, 350 F.3d 706, 711–12 (8th Cir. 2003)). The court then balances these factors against the severity of the sanction to reach a fair result. *See Lopez*, 2012 WL 2343415 at *3. Although the trial court retains broad discretion in deciding on a

particular sanction, that discretion "is not absolute," *Doe v. Young*, 664 F.3d 727 (8th Cir.2011), and "the district court's discretion narrows as the severity of the sanction or remedy it elects increases," *Wegener*, 527 F.3d at 692. For example, where a sanction is "tantamount to a dismissal of [a party's] claims," the district court should consider lesser sanctions. *Heartland Bank v. Heartland Home Fin., Inc.*, 335 F.3d 810, 817 (8th Cir.2003). Further, Defendants' proposed sanction—complete exclusion of evidence—"is a harsh penalty and should be used sparingly." *Wegener*, 527 F.3d at 692 (internal quotation marks omitted) (quoting *ELCA Enters. v. Sisco Equip. Rental & Sales*, 53 F.3d 186, 190 (8th Cir.1995)).

Keeping in mind the Eighth Circuit's animosity toward exclusion of evidence or sanctions that will result in a de facto dismissal, the Court will now consider the various factors listed in *Wegener*. First, the Court will consider Plaintiff's reason for noncompliance with the rule. In other words, this factor asks if the party was substantially justified in its delay. *See Wegener*, 527 F.3d at 693. At the outset, the Court notes that Plaintiff's counsel conclusively states, without citing anything other than the plain text of Rule 26(a)(2)(C), that Plaintiff's disclosures are adequate and comply with the rule. However, as stated above, the Court disagrees that Plaintiff's disclosures satisfy Rule 26(a)(2)(C). Indeed, counsel's misinterpretation of the rule's requirements does not substantially justify Plaintiff's failure to comply.[28]

---

**28.** Even liberally reading the answer to interrogatories in a way that leads the Court to believe that the answers describe "the subject matter on which the witness is expected to present evidence," and even perhaps "the facts ... to which the witness is expected to testify," the Court still finds the answers completely lack the mention of any opinion. It is also important to note that misinterpreting

the rule because it was "new" does not justify Plaintiff's failure. By the time the suit reached federal court, Rule 26(a)(2)(C) had been in place for nine months. When Plaintiff filed expert disclosures, on July 9, 2012, the rule had been in effect for over a year and a half. Finally, a number of district court opinions had discussed and interpreted the rule by July 9, 2012. *See, e.g., Lopez*, 2012

■ Thus, the Court will look to see whether a delay, or in this case, a failure, to provide the disclosures was substantially justified for reasons other than misinterpreting the rule. According to the original scheduling order, filed March 22, 2012, Plaintiff was to disclose all experts by May 4, 2012. *See* Clerk's No. 26. On April 27, Plaintiff filed an unopposed motion to extend the deadlines, citing counsel's other "pressing" responsibilities. Clerk's No. 30. The Court extended the deadline to June 15, 2012. Clerk's No. 31. Almost two weeks after this deadline, on June 26, 2012, Plaintiff asked for a second extension. *See* Clerk's No. 32. Again, the Court granted the request and reset the deadline for July 8. *See* Clerk's No. 33. At 3:00 AM on July 9, Plaintiff filed her responses to Defendants' interrogatories, including her designation of experts. Defs.' Br. I at 5. Plaintiff offers no excuse outside of counsel's other responsibilities and obligations, and the Court granted Plaintiff's two extensions. Therefore, the Court finds that Plaintiff's failure to adequately disclose experts was not substantially justified.

The Court now turns to the second factor in *Wegener*—the surprise and prejudice to the opposing party. Here, Defendants received the names of the treating-physician witnesses along with some minimal disclosures—such as the medical records previously disclosed. Surprise, however, is generally not a large concern in relation to treating physicians. *See Lopez,* 2012 WL 2343415 at *4 ("Defendant cannot legitimately claim that she is surprised ... since the Plaintiff provided at least a minimal disclosure by the court ordered expert deadline.... Defendant has all of

Plaintiff's medical records in her possession and has undoubtedly been able to review those records ... [and] possesses the basis for any of the proposed opinions."); *Crabbs,* 2011 WL 499141 at *2–3 (explaining the reasoning of "the report requirement [is] to give fair notice of opinion testimony and time for the opponent to prepare," but nevertheless allowing expert testimony that was "limited to the subject matter of [the physicians'] treatment as disclosed in medical records"). While certainly Defendants have, in some way, been prejudiced by Plaintiff's failure to comply with the rule—for example, by the time and cost of preparing a lengthy motion for summary judgment based on excluding expert testimony—the prejudice that results from Plaintiff's inadequate disclosure with respect to treating physicians is minimal. Plaintiff responded to interrogatories on July 9, 2012, more than a month before Defendants' expert deadline and over four months before the end of discovery, thus giving Defendants adequate time to prepare cross-examinations and rebuttal witnesses based on the physicians' medical records.[29]

The other non-retained "expert" witnesses disclosed by Plaintiff present additional problems, however. While the calling of the witness at trial would not surprise Defendants, the testimony of the non-treating-physician experts would constitute a surprise. Unlike the treating physicians listed in Plaintiff's answer to Interrogatory 3, Defendants have no documents or other information from which to prepare cross-examination or rebuttal witnesses to combat the testimony or any way to predict what the testimony of

---

WL 2343415 (June 20, 2012); *Ballinger,* 2012 WL 1099823 (Mar. 29, 2012); *Kristensen,* 2011 WL 5320686 (June 3, 2011); *Nicastle,* 2011 WL 1674954 (May 3, 2011); *Crabbs,* 2011 WL 499141 (Feb. 4, 2011).

**29.** Defendants did, in fact, seek out expert testimony to rebut the potential testimony of Plaintiff's experts. *See* Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summ. J. Ex. A (Clerk's No. 42).

these witnesses will be. Defendants cannot glean from the inadequate expert disclosures the opinions to which the non-retained experts are likely to testify. There are a few exceptions, insofar as some of the witnesses have produced prior documents.[30] For the majority of these witnesses, however, any expert testimony would constitute surprise and would be highly prejudicial to Defendants.

The Court must now consider "the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial." *Wegener*, 527 F.3d at 692. Trial has recently been rescheduled for June 3, 2013—approximately two months away. While other deadlines have been pushed back throughout the duration of the case, the trial date was only recently extended from its original and long-standing date of April 15, 2013. *See id.* at 690, 693 (expressing concern about further delaying a trial after it had already been rescheduled four times and the start date pushed back almost a year). Given the close proximity of the trial, even after the date was extended, there is substantial concern that completely reopening discovery (which has been closed since November 19, 2012) to depose experts and find rebuttal witnesses would have a negative effect on the order and efficiency of the trial. Indeed, it may unduly prolong the case.

Finally, the Court must examine the importance of the expert testimony to the case. Although the Court is unsure what the medical reports say, Defendants repeatedly assert that expert testimony is paramount to Plaintiff's case. Simply put, without expert testimony, it is impossible for Plaintiff's claims to succeed. For the non-medical experts, however, the Court

cannot know the extent or importance of their expert testimony. Clearly, Plaintiff relies on many of these witnesses to provide the factual background of the case, but for the most part, Plaintiff has failed to list what their opinions will be, has failed to list what facts they will testify to, and has failed to provide any explanation of the relevance of their expert testimony to the case. Indeed, in her resistances to Defendants' motions for partial summary judgment, Plaintiff does not rely on a single non-retained expert's testimony; rather, she merely tells the Court experts exist and she will present experts at trial.

 Balancing these factors, the Court must now fashion an appropriate sanction or remedy for Plaintiff's failure to comply with Rule 26(a)(2)(C). Interestingly, none of the witnesses listed by Plaintiff in her response to the expert interrogatory differ from those listed on the fact-witness interrogatory. Additionally, with regard to the overlapping witnesses, the answers to both interrogatories are identical. After balancing all factors, and in light of Plaintiff's answers to Defendants' interrogatories, the Court finds that the expert witnesses should not be completely prohibited from testifying; rather, their testimony must be limited. In similar situations, other courts have come to the same conclusion and have limited testimony to the information contained in the witnesses' respective reports. *See Lopez*, 2012 WL 2343415 at *5 (limiting the testimony of inadequately disclosed medical professionals to the "information disclosed within the Plaintiff's disclosed medical records" and allowing testimony of the "treating physician's respective records and reports and any reasonable factual inferences that can be drawn therefrom"); *Ballinger*, 2012 WL 1099823 at *5 ("[The physician's] testimony is limited to

---

**30.** For example, reports from witnesses such as Michele Catellier, the associate state medical examiner who produced the "Report of

Autopsy of Norman Anderson," do provide *some* background on the subject of their testimony.

personal observations, diagnoses, and treatment contained in the medical records and formed in the course of treatment."); *Crabbs*, 2011 WL 499141 at *3 ("[I]n the absence of Rule 26(a)(2)(C) summaries, the opinion testimony of [the] treating physicians ... will be limited to the subject matter of their treatment as disclosed in the medical records and to opinions formed in the course of the treatment provided by them."). The Court finds the reasoning in these cases persuasive and will allow experts to testify with respect to already disclosed reports. This appears a proper way to avoid surprise and prejudice to the opposing parties.

Accordingly, in the present case, the opinion testimony of all of the treating physicians, as well as the other non-medical witnesses who provided other reports[31] will be limited (at least insofar as "expert" testimony is concerned)[32] to the "records[,] reports[,] and any reasonable factual inferences that can be drawn therefrom." *See Lopez*, 2012 WL 2343415 at *5. Allowing opinion testimony outside of these strict limits or by any other witness would cause unfair surprise and undue prejudice to Defendants and would prolong the case by re-opening discovery with only a short period of time before the scheduled start of trial. The failure to adequately disclose experts in this case was neither substantially justified nor harmless. Thus, excluding expert testimony as outlined in this Order is an appropriate sanction. Fed.R.Civ.P. 37(c)(1).

### 2. *Plaintiff's wrongful death claim (Count VII).*

Iowa statutory law allows a party to bring an action to recover damages for wrongful death if the decedent, had he lived, would have been able to bring the same cause of action. *See Troester v. Sisters of Mercy Health Corp.*, 328 N.W.2d 308, 312 (Iowa 1982) (explaining that a claim for wrongful death in Iowa stems from "Iowa Code section 611.20, a survival statute, [that] keeps alive for the benefit of the decedent's estate the cause of action which the deceased prior to his death could have brought had he survived the injury, with recovery enlarged to include the wrongful death") (citing *Egan v. Naylor*, 208 N.W.2d 915, 917 (Iowa 1973)). Therefore, the elements of wrongful death are synonymous with the elements of the underlying tort, the only difference being that the "injury" of the underlying tort is the death of the decedent.

In the present case, Plaintiff claims that "Defendants' *tortious acts*[33] ... resulted in a mental condition which, in turn, resulted in Anderson's uncontrollable impulse to commit suicide, and/or which prevented Anderson from realizing the true nature of the act of suicide." Am. Compl. ¶ 121. Defendants do not, at this point, specifically argue about any of the alleged underlying "tortious acts"; rather, Defendants challenge the "injury" and "causation" aspects of Anderson's death. *See* Defs.' Br.

---

**31.** These witnesses include any person who had signed or helped develop a type of written record—for example, Michele Catellier can offer opinion testimony as to the autopsy of Norman Anderson.

**32.** The Court's decision regarding expert testimony has no impact on any witness's eligibility to testify as a fact witness.

**33.** Plaintiff is somewhat vague as to what exactly constitutes the tortious acts, but refers

the Court to "the preceding counts and paragraphs" in her Amended Complaint. Presumably, Plaintiff is relying on the other claims in the Amended Complaint, i.e., Defendants' alleged breach of contract, tortious interference with a contract, intentional infliction of emotional distress, violation of ICRA, interference with FMLA rights, retaliation for exercising FMLA rights, and disability discrimination. *See* Am. Compl. ¶¶ 77–157.

I at 7–10. Thus, the Court will evaluate only whether Anderson suffered an "injury" that may be compensable and the causation aspect of Plaintiff's wrongful death claim, i.e., whether Defendants' actions led to Anderson's alleged suicide.

### a. *Did Anderson commit suicide?*

 Defendants first challenge whether the claimed injury—suicide or a mental defect so severe as to "prevent[ ] Anderson from realizing the true nature of the act of suicide"—actually occurred. *See* Defs.' Br. I at 7–9. It is axiomatic that if Anderson did not commit suicide and his death was an accident, Defendants cannot be liable for his wrongful death. Because the Court believes that Plaintiff has failed to generate a genuine issue of material fact as to the cause of the alleged suicide (i.e., that Defendants' actions led to Anderson's suicide), the Court will assume, without deciding, that Plaintiff has generated a genuine issue of material fact as to whether Anderson committed suicide and will not fully consider the issue.[34]

### b. *Assuming the decedent committed suicide, has Plaintiff raised a genuine issue of material fact as to the cause of that suicide?*

 Defendants assert that, assuming Plaintiff has proven a suicide, she has failed to raise a genuine issue of material fact regarding the cause of the suicide. Defs.' Br. I at 9–10. In other words, Plaintiff has failed to point to any facts supporting a conclusion that Defendants' actions caused Anderson to commit suicide. *Id.* More specifically, Defendants assert that Plaintiff fails to meet this burden because she lacks required expert testimony to engender a jury question. *Id.* at 10–11. Under Iowa law, to succeed on a tort claim, a plaintiff must prove the two components of causation, cause in fact and legal cause. *Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009).

 While Plaintiff is correct in asserting that causation is almost always a question for a jury,[35] *id.*, the jury must have

---

**34.** The Court notes, however, that the claim would be very close. Under Iowa law, "generally the question of suicide is one for the jury." *Brown v. Metro. Life Ins. Co.*, 233 Iowa 5, 7 N.W.2d 21, 24 (Iowa 1942). There is a presumption against suicide under Iowa law that has "its basis in the love of life and the instinct of self-preservation, the fact that self-destruction is contrary to the general conduct of mankind and that suicide by a rational man is an act of moral turpitude." *Id.*; *accord Estate of Tedrow v. Standard Life Ins. Co.*, 558 N.W.2d 195, 197 (Iowa 1997) (quoting with approval *Brown* ); *Bill v. Farm Bureau Life Ins. Co.*, 254 Iowa 1215, 119 N.W.2d 768, 771 (Iowa 1963). Even though this presumption arises almost exclusively in the context of life insurance cases, the rationale behind the rule extends beyond this narrow set of cases and would be applicable in the present case. The presumption "has the effect of evidence," *Bill*, 119 N.W.2d at 771, and "operates as a presumption in favor of the theory of accident," *Tedrow*, 558 N.W.2d at 197. The presumption has traditionally been used to generate jury questions where the party is moving for summary judgment or a directed verdict declaring a person *did* commit suicide. *See Tedrow*, 558 N.W.2d at 197; *Bill*, 119 N.W.2d at 772; *Brown*, 7 N.W.2d at 24. A party can overcome this presumption, however, by offering a "theory by evidence which makes it reasonably probable [that the death was the result of suicide], and more probable than other hypotheses based on such evidence." *Bill*, 119 N.W.2d at 774. The Iowa Supreme Court has held in some situations that a mere "possibility," in conjunction with other evidence, *can* lead to a submissible jury question. *See Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 101 N.W.2d 167, 170 (Iowa 1960). In this situation, the additional evidence adduced by Plaintiff, in conjunction with the medical examiner's testimony that suicide was "possible," *arguably* is sufficient to raise a question for the jury.

**35.** Indeed, the Iowa Judicial Branch has codified this rule in the Iowa Rule of Appellate Procedure 6.904(3)(j), which states "General-

some evidence to support its finding. *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 792 (Iowa 2009) ("[B]efore the court can submit [a] claim ... to the jury, the record must contain substantial evidence to support the submission.") (citing *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001)). The party attempting to prove causation need not "exclude all other reasonable theories or hypotheses," but generally must "prove his theory by evidence which makes it reasonably probable, and more probable than any other hypothesis based on such evidence." *Id.* at 793; *see also Bryant v. Rankin*, 468 F.2d 510, 515 (8th Cir.1972) ("[Under Iowa law,] the evidence adduced by the plaintiff must show that 'plaintiff's theory is reasonably probable, not merely possible, and more probable than any other theory based thereon.'") (quoting *Stickleman v. Synhorst*, 243 Iowa 872, 52 N.W.2d 504, 507 (Iowa 1952)); *Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 101 N.W.2d 167, 170 (Iowa 1960) (explaining that "a possibility, rather than probability" of causation is insufficient to "warrant submitting [the question] to the jury").

In some situations, however, a plaintiff who puts forward merely a "possible" theory may survive summary judgment—provided that the possibility is coupled with sufficient evidence to give rise to a plausible theory that generates a genuine issue of material fact. *See Bradshaw*, 101 N.W.2d at 170. This situation exists, for example, where a doctor or other expert opines that a certain event is the *possible* cause of a condition or injury, and the plaintiff adduces evidence that such an event was the only injury to his or her body. *Id.* (citing *Chenoweth v. Flynn*, 251 Iowa 11, 99 N.W.2d 310, 313–14 (Iowa 1959) (reversing a directed verdict and

holding that the causation question should have gone to the jury where the plaintiff suffered a foot injury only after an event, had no prior injury to that part of her foot, and the doctor said such an event was the possible cause of the injury); *Rose v. John Deere Ottumwa Works*, 247 Iowa 900, 76 N.W.2d 756, 761 (Iowa 1956) (affirming a workers' compensation award despite a defendant's causation challenge where a plaintiff had trouble with his back only after a particular event, and where his doctor said the event was the possible cause of the plaintiff's back trouble)). In that situation, the combined evidence may be sufficient to reach the jury. *Id.*

■ Further, when a question of causation lies outside the general knowledge and understanding of a layperson, a party must use expert testimony to prove its theory. *Donovan v. State*, 445 N.W.2d 763, 766 (Iowa 1989); *see also Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 637 (Iowa 1990). If causation is obvious, however, a party need not rely on an expert witness. *Vaughn*, 459 N.W.2d at 637; *see also Bryant*, 468 F.2d at 514 (requiring expert testimony and explaining it was necessary because "[t]his is not a case of obvious lack of care comparable to dropping a part of a tooth into a patient's lung; or failing to x-ray the proper portion of a patient's lumbar vertebra; or puncturing a patient's neck instead of her trachea"). To determine whether a subject is outside the general comprehension of a layperson, the Court must engage in a case-by-case, common-sense determination of "whether the untrained layman would be qualified to determine intelligently .... the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *M–Z En-*

ly questions of ... proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law."

ters., Inc. v. Hawkeye–Security Ins. Co., 318 N.W.2d 408, 414 (Iowa 1982) (internal quotation marks omitted) (quoting Fed. R.Evid. 702 advisory committee's notes (in turn quoting Mason Ladd, *Expert Testimony*, 5 Vand. L.Rev. 414, 418 (1952))). In applying this framework, the Court must work backwards. First, it must determine whether expert testimony is necessary. Then, it must make a determination as to whether the evidence is sufficient for the question to reach the jury. With this framework in mind, the Court will turn its attention to the merits of Defendants' causation argument.

 The Court must first consider whether expert testimony is necessary for Plaintiff to substantiate her claim. Due to its complex and scientific nature, medical causation almost always requires expert testimony. *See Chaney v. Smithkline Beckman Corp.*, 764 F.2d 527, 529 (8th Cir.1985) ("The subject of carcinogens is highly complex."); *Korte v. Mead Johnson & Co.*, 824 F.Supp.2d 877, 887 (S.D.Iowa 2010) (holding that in a products-liability case dealing with medical causation, "Plaintiffs must use the testimony of medical experts to prove medical causation"); *Doe*, 766 N.W.2d at 794 ("[I]n many cases where we have held that a fact question was engendered on the issue of emotional harm and causation, we have relied on the testimony of physicians and psychiatrists." (internal quotation marks and citation omitted)); *Bradshaw*, 101 N.W.2d at 171 ("Such a matter as the causal connection between plaintiff's fall in defendant hospital and his condition at the time of the operation in December is not within the knowledge and experience of ordinary laymen."); *but see Stickleman*, 52 N.W.2d at 507 (not requiring expert testimony where "reasonable minds could find Dr. Dorner punctured a blood vessel in the throat when his hypodermic needle missed the mark and this caused plaintiff's excessive bleeding"). In the present case, there are a number of potential causes of Anderson's alleged suicide; indeed, his numerous substance abuse and mental health problems are well documented, as are other recent traumatic events in his life such as the death of his mother and the foreclosure of his home. Where there are multiple possible causes to an injury, expert testimony is necessary to determine which cause was the actual and legal cause of the injury. *See Doe*, 766 N.W.2d at 794–95 (holding expert testimony was necessary to show causation in a case where the plaintiff had undergone prior mental injuries that may have caused his injury); *Bradshaw*, 101 N.W.2d at 171 (holding same but the plaintiff had physical, rather than mental, injuries). Therefore, the Court finds that expert testimony is necessary to demonstrate that Defendants caused Anderson's injury.

Next, the Court must consider whether Plaintiff has provided sufficient evidence to put forward a theory of causation that is "reasonably probable—not merely possible, and more probable than any other hypothesis based on such evidence," *Doe*, 766 N.W.2d at 793, or alternatively, whether there is "testimony, nonexpert in nature" that, in conjunction with a "possibility" gives rise to a submissible jury question, *Bradshaw*, 101 N.W.2d at 170. In the present case, Plaintiff has failed to provide any such evidence.

 The present case mirrors the situation faced by the Iowa Supreme Court in *Doe. See* 766 N.W.2d 787. In *Doe*, the plaintiff sued his employers and his treating hospital for emotional distress stemming from their disclosure of medical records to his co-employees. *Id.* at 788. Prior to the disclosure, however, the plaintiff had undergone recent intense personal stress in his life—his mother had just passed away, his car was repossessed, and he had attempted suicide. *Id.* at 791. Following a hospitalization due to his suicide attempt,

some of Doe's co-workers learned of his plight and began harassing him. *Id.* at 791–92. After learning that someone had leaked his medicals records, and after suffering harassment from his coworkers, the plaintiff "became less social ... more introverted[, and] ... his sex drive diminished significantly," among other changes. *Id.* at 792. At trial, the plaintiff presented no expert evidence that his emotional distress was caused by the disclosure of records rather than by his previous problems; instead, the evidence offered to show the emotional distress was due to the disclosure of records "consisted exclusively of his own conclusory statements." *Id.* at 795. Although the jury found in favor of the plaintiff, the judge granted the defendants a judgment notwithstanding the verdict due to the lack of expert testimony regarding causation, and the Supreme Court affirmed. *Id.* The Iowa Supreme Court held that in such a situation, a judgment notwithstanding the verdict was proper because "substantial evidence did not exist to submit the issue of causation to the jury." *Id.*

Anderson's case is strikingly similar. Anderson had gone through incredible personal difficulties prior to his termination—financial troubles, alcohol addiction, and his mother's death. He had even attempted suicide prior to his termination. Plaintiff has failed to proffer any record evidence that would pinpoint Anderson's termination as the driving force behind his alleged suicide. The only argument Plaintiff makes with regard to causation can be classified as a temporal argument, i.e., that because Plaintiff's death occurred in close temporal proximity to his termination, there must be a genuine issue of material fact as to causation. *See* Pl.'s Resistance I at 16. However, a fact "based only on the assumption of causation due to a temporal relationship is 'entitled to little weight in determining causation.'" *Korte*, 824 F.Supp.2d at 894

(quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir.1998) and citing *Bland v. Verizon Wireless (VAW) L.L.C.*, 2007 WL 5681791, at *10 (S.D.Iowa Aug. 9, 2007), *aff'd*, 538 F.3d 893 (8th Cir.2008) (holding mere temporal proximity was insufficient to establish causation)). Simply put, without additional expert testimony or evidence, Plaintiff's temporal-proximity argument fails to satisfy Iowa's longstanding rule that the plaintiff's causation theory must be "reasonably probable—not merely possible, and more probable than any other hypothesis based on such evidence." *Doe*, 766 N.W.2d at 793. Because Plaintiff has failed to provide substantial evidence to satisfy this standard, the issue of causation should not reach the jury. *Id.* at 795.

Based on the record before the Court, any jury verdict in favor of the Plaintiff for wrongful death would be the result of sympathy, immense speculation, and a long line of assumptions. Indeed, the summary judgment record is devoid of evidence that would demonstrate that Anderson's death was more likely precipitated by his termination than by any other cause. *See Chaney*, 764 F.2d at 529 ("The jury, however, is not permitted to speculate about the substantive elements of a case."). Without question, losing one's job can be a traumatic experience. In this case, however, mere conjecture and speculation would be the only way for a jury to conclude that Anderson's death was the result of Defendants' actions. Accordingly, summary judgment is GRANTED as to Plaintiff's wrongful death claim in Count VII.

### B. *Defendants' MSJ II*

In Defendants' MSJ II, Defendants move for summary judgment on Plaintiff's claims of breach of contract (Count I), intentional interference with written contract (Count II), intentional infliction of emotional distress (Count IV), and wrong-

ful death (Count VII). Because the Court has already ruled on Plaintiff's wrongful death claim, there is no need to consider Defendants' additional argument that the claim is barred by the exclusivity provision of Iowa's worker's compensation statute. Thus, the Court turns to consideration of Plaintiff's claims in Counts I, II, and IV.

1. *Breach of written contract.*

▇▇▇▇ Defendants first move for summary judgment on Plaintiff's breach of written contract claim. Defendants assert that Plaintiff, at all times, was an at-will employee, and thus no breach was possible. Defs.' Br. in Supp. of MSJ II ("Defs.' Br. II") (Clerk's No. 51) at 5–10. Under Iowa law, employment relationships are presumed to be "at-will" in nature. "This means the employment relationship is terminable by either party 'at any time, for any reason, or no reason at all.'" *Fitzgerald v. Salsbury Chem., Inc.,* 613 N.W.2d 275, 280 (Iowa 2000) (quoting *Phipps v. IASD Health Servs. Corp.,* 558 N.W.2d 198, 202 (Iowa 1997)); *Hunter v. Bd. of Trustees,* 481 N.W.2d 510, 513 (Iowa 1992). Where the parties are silent as to the duration of the employment relationship, employment at-will is presumed. *See Fitzgerald,* 613 N.W.2d at 280 ("Absent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-will.") (citing *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 282 (Iowa 1995)). Iowa courts have carved out only two narrow exceptions to this rule: (1) if a discharge is in clear violation of a well-

recognized and defined public policy of the State; or (2) when an employee handbook creates a unilateral employment contract.[36] *Id.* at 282 (quoting *Springer v. Weeks & Leo Co.,* 429 N.W.2d 558, 560 (Iowa 1988) and *French v. Foods, Inc.,* 495 N.W.2d 768, 769–71 (Iowa 1993)); *see also Bradshaw v. Brown Group, Inc.,* 258 F.3d 847, 849 (8th Cir.2001) (discussing the unilateral contract exception to Iowa's at-will employment doctrine).

▇▇▇ Plaintiff asserts that Emerson's Sick Leave Policy constitutes a unilateral employment contract, and claims that Emerson terminated Anderson in breach of that contract.[37] Defendants respond that, in conjunction with other documents, the Sick Leave Policy does not constitute a contract. Defs.' Br. II at 5–10. For an employee handbook or other policy to be considered a unilateral contract, the party asserting a contract must show three things: "(1) the handbook [or other policy] is sufficiently definite its terms to create an *offer;* (2) the handbook is communicated to and accepted by the employee so as to constitute *acceptance;* and (3) the employee provides *consideration.*" *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 283 (Iowa 1995). Defendants do not dispute that Anderson accepted the Sick Leave Policy or that he continued working as to provide consideration; rather, Defendants attack the first element—that the Sick Leave Policy was sufficiently definite in its terms.

▇▇▇▇ When deciding whether a policy is sufficiently definite in its terms as to

---

**36.** The Iowa Supreme Court noted in *Fitzgerald* that, given the exceptions to the at-will employment doctrine, the "traditional doctrine of termination 'at any time, for any reason, or no reason at all' is now more properly stated as permitting 'termination at any time for any *lawful* reason.'" *Fitzgerald,* 613 N.W.2d at 280 (quoting *Phipps,* 558 N.W.2d at 202 and *Lockhart v. Cedar Rapids*

*Comm. Sch. Dist.,* 577 N.W.2d 845, 846 (Iowa 1998)).

**37.** In her original complaint, Plaintiff asserted that this termination was also in violation of public policy. Am. Compl. ¶¶ 115–19. The Court, however, rejected this argument and dismissed the claim after Defendants' Second Motion to Dismiss. *See* Clerk's No. 22.

create an offer, the Court must determine "whether a reasonable employee, upon reading the policy, would believe they had been guaranteed certain protections by their employer." *Fesler v. Whelen Eng'g Co., Inc.,* 794 F.Supp.2d 994, 1014 (S.D.Iowa 2011) (citing *Jones v. Lake Park Care Center, Inc.,* 569 N.W.2d 369, 374 (Iowa 1997)). The Court generally considers three factors in making this determination: "(1) whether the personnel polic[ies] ... constitute mere guides or directives; (2) whether the language of the [policy and] procedures is detailed and definite or general and vague; and (3) whether the employer has the power to alter the procedures at will." *Id.* Additionally, the Court will look at any disclaimers in making a sufficiency determination. *See Anderson,* 540 N.W.2d at 288; *Kartheiser v. Am. Nat. Can Co.,* 84 F.Supp.2d 1008, 1015 (S.D.Iowa 1999). In the absence of ambiguity, whether an employee handbook or policy constitutes a contract is a question of law. *French,* 495 N.W.2d at 770.

■ Courts have traditionally considered the first two factors together— "whether the policy is a mere guideline or a directive [and] whether the language of the policy is detailed and definite or general and vague." *Kartheiser,* 84 F.Supp.2d at 1013. Courts look for specificity in procedures and strong, unequivocal, command words. *See, e.g., Fesler,* 794 F.Supp.2d at 1015 (finding that words such as "may" indicate mere guidelines and that "definiteness requires a fair amount of specificity"); *Kartheiser,* 84 F.Supp.2d at 1013 (explaining that a policy setting out "who is eligible for overtime, under what circumstances and at what levels, and reporting and approval requirements" met the language of an "offer"); *Anderson,* 540 N.W.2d at 287 (finding "language of command" and "specific procedures" support a finding of a unilateral contract). In the present situation, the Sick Leave Policy expressly describes the specific procedure

that an employee must take to be eligible for salary continuance and also states the steps an employee must take to return to work. *See* Pl.'s Am.App. at 1–2. Further, these procedures contain language of command. The Sick Leave Policy repeatedly states that an employee "is required" to act, "must show" certain documentation, and *"will be* reinstated to the same or equivalent position with the same pay, benefits and terms and conditions of employment." *Id.* (emphasis added). Therefore, this factor weighs in Plaintiff's favor and supports a finding that a unilateral contract existed.

However, in determining "whether a reasonable employee, upon reading the policy, would believe they had been guaranteed certain protections by their employer," *Fesler,* 794 F.Supp.2d at 1014, the Court still must consider "whether the employer had the power to alter the procedure[] at will or whether [it was] invariable." *Kartheiser,* 84 F.Supp.2d at 1013. Although the Sick Leave Policy states that "employees will be reinstated," it also warns employees that "excessive absenteeism, even if caused by injury or illness may be grounds for termination if it interferes significantly with or causes any undue hardship upon the performance of duties." Pl.'s Am.App. at 2. At first glance, this appears to allow Emerson to determine when it believes an employee's absences have become "excessive" and provides Emerson with some discretion in applying the Sick Leave Policy. Part of the Sick Leave Policy, however, expressly refers to a different and related policy, Emerson's Absence and Attendance Policy and Procedure, which reveals that absences are "excessive" only after an employee has greater than five absences during the year. *Id.* at 1, 7. Further, the Sick Leave Policy limits when termination is possible—only when the absence "interferes significantly with or causes any un-

due hardship upon the performance of duties." *Id.* at 2. Therefore, while the Sick Leave Policy grants Emerson some discretion in termination, it expressly limits these terminations to people who have been absent for greater than five days and whose absences have caused significant problems for the company. As a result, this factor supports the finding of a unilateral contract.

■ The final factor the Court must consider is the effect certain disclaimers had on the Sick Leave Policy. "A disclaimer can prevent the formation of a contract by clarifying the intent of the employer not to make an offer." *Anderson,* 540 N.W.2d at 287. Further, disclaimers "should be considered in the same manner as any other language [in the policy]." *Id.* at 288. More specifically, the Court should consider the clarity of the disclaimer—what is the effect?—and the scope of the disclaimer's applicability. *Id.* When a disclaimer is contained in a separate document, however, the employee must first receive the disclaimer before it can affect the employee's contractual rights. *Kartheiser,* 84 F.Supp.2d at 1015. Defendants in the present case claim that a number of disclaimers were distributed to Anderson, but fail to support that assertion with record evidence.[38] Based on the record provided to the Court, the Court can infer that Anderson never received his employee handbook, but cannot make any determination with regard to the Employment-at-Will Policy. *See supra* notes 17–18.

Defendants have additionally produced two extrinsic documents that they claim have an effect on the Sick Leave Policy. The first is Anderson's original employment application from September 12, 1999. Def.'s App. II at 2. This document was signed before Anderson was ever offered employment, and while it is unambiguous in its coverage and alleged scope, a number of other facts—time, additional policies, job changes, company changes, and similar occurrences—could lead a reasonable employee to disregard the disclaimer in the application. Second, Defendants rely on Anderson's Last Chance Agreement, signed by Anderson on April 20, 2009, which states: "I also understand that my entering into this agreement, does not, and is not intended to, alter my at-will employment status with the Company." Defs.' App. at 4. Although this statement mentions Anderson's at-will status, it says nothing about disclaiming other policies and seems to disclaim only the Last Chance Agreement. Indeed, it reaffirms that the Last Chance Agreement keeps things status quo, except for a few additional requirements for Anderson. As a result, the Court finds for purposes of summary judgment that this disclaimer has no effect on the Sick Leave Policy.

■ Considering all of the evidence in the record in the light most favorable to Plaintiff, the non-moving party, the Court finds there is a genuine issue of material fact as to whether the Sick Leave Policy constitutes a unilateral contract. *See Hinshaw v. Ligon Indus., L.L.C.,* 551 F.Supp.2d 798, 808–09 (N.D.Iowa 2008) (explaining that where there is ambiguity in the record, the Court should not declare whether a contract exists as a matter of law) (citing *French,* 495 N.W.2d at 770). Accordingly, the Court will presume, for purposes of its further analysis, that the Sick Leave Policy *is* a unilateral contract.

■ Assuming that the Sick Leave Policy constitutes a unilateral contract, the

**38.** For an explanation of why this evidence cannot be accepted when ruling on this motion, see *supra,* notes 17–18.

Court, upon review of the record, can discern no breach of the contract by Emerson. The Sick Leave Policy states that Emerson can terminate an employee for "excessive absenteeism, even if caused by injury or illness ... if it interferes significantly with or causes any undue hardship upon the performance of duties." Pl.'s Am.App. at 2. The Absences & Attendance Policy defines "excessive" as any number of absences greater than five. *Id.* at 7. Therefore, there is no doubt that Anderson had "excessive" absences in 2009—he was gone from work for almost the entire month of March due to alcohol-related treatment, missed multiple days of work to care for his mother, and failed to attend work while in the hospital before his termination. The question, then, would be whether Anderson's absences "interefere[d] significantly with or cause[d] any undue hardship on the performance of duties." *Id.* at 2.

The record demonstrates that Anderson failed to fulfill the request made by Rossman on Friday, July 24. *See* Pl.'s Am. App. at 111–14. Further, due to Anderson's absence, Emerson was required to fly in an employee from Connecticut to do the work for Anderson. Defs.' App. at 40 (Rossman Aff. ¶ 14). Considering these undisputed facts, it appears that the conditions for termination of the Sick Leave Policy were fulfilled. The Court is inclined to grant summary judgment on the breach of contract claim for this reason. The Court notes, however, that Defendants did not specifically raise this argument in Defendants' MSJ II; accordingly, granting summary judgment at this time would be improper. Under Federal Rule of Civil Procedure 56(f)(2) a court can "grant the motion on grounds not raised by a party," but only after first "giving notice and a reasonable time to respond." Therefore, the Court will reserve final ruling on Defendants' MSJ II as it relates to Plaintiff's breach of contract claim. Each party may file a supplemental brief on the issue raised by the Court no later than April 12, 2013. Each party may file a response to the other party's brief no later than April 24, 2013. After receiving the parties' submissions, the Court will enter a supplemental Order regarding the propriety of an entry of summary judgment on Plaintiff's Count I.

2. *Intentional interference with a written contract or intentional interference with a business advantage.*

 Under Iowa law, a party seeking recovery for intentional interference with a contract must first show that a third party committed the tort; a party to a contract cannot be liable for such a claim. *Jones v. Lake Park Care Ctr., Inc.,* 569 N.W.2d 369, 376 (Iowa 1997). An officer, supervisor, or other agent of a company generally acts on behalf of the corporation, is considered an extension of the corporation, and thus cannot be liable for intentional inference. *See Harbit v. Voss Petroleum, Inc.,* 553 N.W.2d 329, 331 (Iowa 1996) (affirming a summary judgment on a tortious interference with a contract claim because "all defendants were either [the plaintiff's] employers or their agents[, and] ... the tort of malicious interference with a contract can only be committed by a third party, not a party to that contract"). Agents of a corporation are protected from personal liability by a qualified privilege. *See Jones,* 569 N.W.2d at 376. The protection afforded corporate agents, however, is not absolute; if an agent exceeds her qualified privilege, she can be liable for intentionally interfering with business relations. *Id.* Therefore, to recover from a corporate agent for intentionally interfering with a business relation, a plaintiff must first demonstrate that the agent has exceeded her qualified privilege. *Id.*

■ An agent only exceeds her qualified privilege when he or she "fails to act in good faith to protect the interests of the corporation." *Id.* "If an officer or director *intends* to promote the best interests of the corporation, he or she acts in good faith and is protected from personal liability by the qualified privilege." *Id.* at 377 (emphasis added). Therefore, to survive Defendants' MSJ II regarding Count II, Plaintiff must identify sufficient evidence to generate a genuine issue of material fact as to whether Bielen and Rossman acted beyond their qualified privilege and intended to act against the best interests of the corporation.

■ On the present record, there is simply no evidence that would support a conclusion that either Rossman or Bielen exceeded their qualified privilege.[39] Plaintiff claims simply that "individual Defendants Bielen and Rossman took swift and calculated action to terminate Mr. Anderson's decade-long employment, while he was hospitalized." Pl.'s Resistance II at 22. This does nothing, however, to explain how Defendants' actions were not intended to promote the best interests of *the corporation* or how they were done in bad faith. In other words, Plaintiff fails to explain how Bielen or Rossman exceeded their qualified privilege. Indeed, before terminating Anderson, Rossman and Bielen discussed the situation with the company's attorney and determined it would be in the best interest of the company to terminate Anderson's employment due to his failure to communicate with his supervisor and to complete his assigned tasks. Def.'s App. II at 40 (Rossman Aff. ¶ 16), 45–46 (Bielen App. ¶¶ 13–14). The Court

concludes that at all times relevant to this litigation, Bielen and Rossman acted within their qualified privilege.

■ The Court notes that Plaintiff also asserts that, in the absence of a unilateral contract, Rossman and Bielen intentionally interfered with Anderson's rights as an employee at will.[40] Pl.'s Resistance Br. II at 22–23. Like a claim for intentional interference with a contract, intentional interference with employment at will requires a third party to commit the tort. Indeed, a plaintiff must first prove that he or she "was an at-will employee of a third person." *Knutson v. Sioux Tools, Inc.*, 990 F.Supp. 1114, 1126 (N.D.Iowa 1998) (citing *King v. Sioux City Radiological Group, P. C.*, 985 F.Supp. 869, 881–82 (N.D.Iowa 1997) and *Toney v. Casey's Gen. Stores, Inc.*, 372 N.W.2d 220, 222 (Iowa 1985)). For the reasons explained above, Plaintiff has failed to show how Bielen or Rossman is a third party in the circumstances of this case.

For the reasons discussed above, Defendants' MSJ II is GRANTED with respect to Plaintiff's intentional interference with a contract, or in the alternative, intentional interference with employment at will, claim.

### 3. *Intentional infliction of emotional distress.*

Finally, the Court must consider Defendants' MSJ II as it relates to Plaintiff's Intentional Infliction of Emotional Distress claim. Defendants raise three arguments explaining why the claim should fail as a matter of law. First, Defendants claim

---

39. At the time of Anderson's termination, Rossman was an officer of the corporation; specifically, he was a vice president and Chief Financial Officer of the company. Defs.' App. at 38 (Rossman Aff. ¶ 2). The same holds true for Bielen, who was the head of Human Resources. Defs.' App. at 43 (Bielen Aff. ¶ 2).

40. Plaintiff first raised this claim in her Resistance to Defendants' MSJ II, and Defendants asked the Court to prohibit Plaintiff from raising it. *See* Pl.'s Resistance II at 22–23; Defs.' Br. in Reply to Pl.'s Resistance II at 5.

that any emotional distress claim would be barred by the exclusive remedy provisions of the Iowa Workers' Compensation Act. Def.'s Br. II at 12–13. Second, they assert that the claim is preempted by the ICRA. *Id.* at 13–14. Third, Defendants attack the merits of the intentional infliction of emotional distress claim. *Id.* at 14–20. The Court will assume, without deciding, that Plaintiff's claims are not barred by Iowa's worker compensation exclusivity principle or by the ICRA because it is clear that Plaintiff's intentional infliction of emotional distress claim cannot succeed on the merits.

■■■ Intentional infliction of emotional distress, under Iowa law, requires the party to prove four elements: "(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress." *Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (quoting *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)).

■■■ To satisfy the first element under Iowa law, outrageous conduct, a plaintiff must show the act was "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985) (internal quotation marks omitted) (quoting *Vinson v. Linn–Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984)). In making this determination, one factor to consider is the relationship between the parties. *See Napreljac v. John Q. Ham-*

*mons Hotels, Inc.*, 461 F.Supp.2d 981, 1041 (S.D.Iowa 2006). Further, the Court must acknowledge that the law demands a "'certain level of emotional toughness[, and] ... plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to the occasional acts that are definitely inconsiderate and unkind.'" *Id.* (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 911 (Iowa 1976)). To hold otherwise would "open wide the door to fictitious claims and to the resolution of trivialities or mere bad manners." *Id.* (quoting *Meyer*, 241 N.W.2d at 911).

■■■ In the present case, Plaintiff claims that Defendants inflicted emotional distress by:

> Continually contacting [Anderson] while on valid leave for his mother's death, and demanding more and more work be completed even though he was deeply grieving; [ ] Complaining to Mr. Anderson about excessive use of vacation, even though he wanted to use vacation time to be with his mother[;] ... Terminating Mr. Anderson for alleged "no call/no show" when Defendants knew or should have known, he was in a hospital and unable to call ... and Refusing to reinstate Mr. Anderson, despite a decade of hard work and invaluable service to Defendants, and despite his literal begging for return to his job....

Am. Compl. ¶ 103.[41] The record fails to demonstrate many of these supposed actions by Defendants. First, there is no evidence in the record that anyone from Emerson contacted Anderson directly while he was on bereavement leave; there are simply two emails from Rossman sent to Anderson's work email address and one

---

41. Plaintiff also states some other alleged causes of Anderson's emotional distress that have no basis in the record—for example, that Anderson was treated much differently and

much worse after signing his "Last Chance" agreement and "Complaining to Mr. Anderson about excessive use of vacation." Am. Compl. ¶ 103.

email to Anderson's secretary. *See* Defs.' Facts II ¶ 16; Pl.'s Am.App. at 98, 106. Even assuming these emails may have reached Anderson directly, two emails over three days does not constitute "continual[ ] contact[ ]," *see* Am. Compl. ¶ 103, and certainly does not rise to the level of "outrageous" conduct. Similarly, there is no evidence to show that Anderson asked to use vacation time and was refused—in fact, Rossman told Anderson to "keep me updated so that the team and I can assist you in the best way possible." Pl.'s App. II at 17. Moreover, Rossman emailed Bielen asking *her* about Anderson's vacation time, but never mentioned anything to Anderson about his use of vacation time. *Id.* at 20.

Further, even assuming that Anderson was discharged for alcoholism and not for no-call/no-show as Emerson claims, this conduct simply does not reach the requisite level of "outrageousness" to support a finding of intentional infliction of emotional distress. *See Northrup,* 372 N.W.2d at 197. In *Northrup,* the Iowa Supreme Court held that firing a plant superintendent for alcoholism in conjunction with a supervisor yelling at the employee, telling the employee he would no longer tolerate his behavior, telling the employee he was "fed up" with him, and calling the employee a liar, was not conduct "outrageous" enough to conclude a genuine issue of material fact existed for the jury to decide. *Id.* Likewise, in the present case, there is simply no conduct "so extreme in degree as to go beyond all possible bounds of decency."

Additionally, it is clear that even if Plaintiff could demonstrate the requisite level of "outrageousness," her claim would still fail on the fourth element of an intentional infliction of emotional distress claim, i.e., that "defendant's outrageous conduct was the actual and proximate cause of the emotional distress." *Barreca,* 683 N.W.2d

at 123. Plaintiff has provided no evidence whatsoever that Defendants' actions led to Anderson's emotional distress. For the same reasons described *supra,* in Section IV.A.2.b of this order, the evidence of causation is insufficient to submit Plaintiff's claim to a jury. *See Doe,* 766 N.W.2d at 795. Accordingly, because Plaintiff cannot generate genuine issues of material fact as to at least two elements of the intentional infliction of emotional distress claim, summary judgment in favor of Defendants is warranted.

## V. CONCLUSION

For the foregoing reasons, Defendants' MSJ I (Clerk's No. 36) is GRANTED. Similarly, Defendants' MSJ II (Clerk's No. 48) is GRANTED with respect to Plaintiff's claims of intentional interference with contract (Count II) and intentional infliction of emotional distress (Count IV). Defendants' MSJ II remains pending as to Plaintiff's breach of contract claim (Count I) while the Court awaits supplemental briefing by the parties, as discussed *supra* in this Order.

IT IS SO ORDERED.